UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-20080-CR-ALTMAN

UNITED STATES OF AMERICA,

v.

JOSE ANTONIO RODRIGUEZ,
JORMAN JOSE GOITIA, *and*
DARIBEL SANCHEZ,

    *Defendants.*

_____/

## ORDER

Our Defendants, Jose Antonio Rodriguez, Jorman Jose Goitia, and Daribel Sanchez, were caught transporting cocaine on the high seas. When Colombia—the country they claimed their vessel was registered in—couldn't confirm or deny the vessel's registry, the U.S. Coast Guard boarded the boat, seized its cargo, and arrested the Defendants. After the Government formally indicted the Defendants under the Maritime Drug Law Enforcement Act (the "MDLEA"), 46 U.S.C. §§ 70503(a)(1) and 70506(b), the Defendants moved to dismiss the Indictment, arguing that the MDLEA is unconstitutional (both facially and as applied to them). *See* Joint Motion to Dismiss the Indictment (the "Motion") [ECF No. 24]. After careful review, we **DENY** the Motion.

### THE FACTS

On February 8, 2022, a U.S. Coast Guard (USCG) Cutter patrol spotted a "go-fast vessel"[1] ("GFV") approximately 169 nautical miles southeast of Isla Beata, Dominican Republic. *See* United States Response in Opposition to Defendants' Joint Motion to Dismiss (the "Response") [ECF No.

---

[1] "A working definition of a go-fast is a power boat which primarily employs speed to evade capture." H.I. Sutton, *3 Types of Go-Fast Narco Boats the Coast Guard Faces*, FORBES, available at https://www.forbes.com/sites/hisutton/2020/08/21/3-types-of-high-speed-smuggling-boats-facing-the-coast-guard (last visited Aug. 15, 2022).

26] at 1; *see also* Motion at 1.[2] The Cutter, CONFIDENCE, "diverted to investigate [and] once in the vicinity, launched the Over the Horizon boats (OTH) with an embarked USCG boarding team." Response at 1-2 (cleaned up). "At this time, the boarding team observed the GFV jettisoning packages prior to arriving on position and gaining positive control of the GFV. One OTH recovered the jettisoned packages while the second OTH gained positive control of the vessel without use of force." *Id.* at 2 (citation omitted). Ultimately, the Coast Guard would seize 15 bales. *Ibid.* "Based on the precise coordinates provided in discovery, it appears as though the vessel was interdicted within Venezuela's Exclusive Economic Zone ("EEZ")." Motion at 1.

"The USCG boarding team reported three crewmen on board who were later identified as Jose Antonio Rodriguez, Jorman Jose Goitia, and Daribel Sanchez." Response at 2. "None of the defendants claimed to be the master of the vessel, but all three crew members made a claim of Colombian nationality for the GFV. The Government of Colombia was contacted but could neither confirm nor deny registration of the vessel. The GFV was treated as a vessel without nationality, therefore, subject to the jurisdiction of the United States and a full law enforcement boarding was conducted." *Ibid.* (citations omitted). The Coast Guard officers conducted four field tests on the substance in the bales—and all four came back positive for the presence of cocaine. *Ibid.* Together, the 15 bales had a sea weight of approximately 430 kilograms of cocaine. *Ibid.*

Over the next ten days or so, the Defendants were brought here—to the Southern District of Florida. *See* Minutes Entries for Initial Appearances [ECF Nos. 3–5] (showing that the Defendants made their initial appearances before Magistrate Judge Edwin G. Torres on February 18, 2022). On

---

[2] We cite mostly to the Government's Response because the MTD includes very few details. And, since the Defendants didn't challenge any of these facts in *either* their Joint Reply to the Government's Response in Opposition to the Joint Motion to Dismiss the Indictment [ECF No. 32] (the "Joint Reply") *or* Defendant Goitia's Reply to Government's Response [ECF No. 29] ("Goitia's Reply"), we take these facts as undisputed. One more thing on this: We'd normally strike Goitia's Reply as an improper second bite at the apple. But we didn't do that here because the document simply adds a meritless argument that has no effect on the outcome of this case.

March 2, 2022, a federal grand jury in our District returned a two-count indictment, charging the Defendants with possessing (and conspiring to possess)—with the intent to distribute—cocaine while onboard a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. §§ 70503(a)(1) and 70506(b). *See* Indictment [ECF No. 9]; *see* Motion at 2. The Defendants have now moved to dismiss that Indictment.

## THE LAW

"A motion to dismiss an indictment is governed by Federal Rule of Criminal Procedure 12(b)." *United States v. Arregoces Barros*, 2022 WL 1135707, at *2 (S.D. Fla. Apr. 18, 2022) (Bloom, J.). Under Rule 12(b)(1), "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." FED. R. CRIM. P. 12(b)(1). "[A] defendant may challenge an indictment on a variety of [ ] grounds, including for failure to state an offense, lack of jurisdiction, double jeopardy, improper composition of the grand jury, and certain types of prosecutorial misconduct." *United States v. Kaley*, 677 F.3d 1316, 1326 (11th Cir. 2012). "[A]n indictment may be dismissed where there is an infirmity of law in the prosecution[.]" *United States v. Torkington*, 812 F.2d 1347, 1354 (11th Cir. 1987). But "a court may not dismiss an indictment . . . on a determination of facts that should have been developed at trial." *Ibid.* Instead, "[t]he sufficiency of a criminal indictment is determined from its face." *United States v. Critzer*, 951 F.2d 306, 307 (11th Cir. 1992).

## ANALYSIS

In their Motion, the Defendants advance two arguments—both unpersuasive. *First*, they say that the provision of the MDLEA under which they were indicted, § 70502(d)(1)(C), is facially unconstitutional. *Second*, they claim that the MDLEA is, at the very least, unconstitutional as applied to them. We also deal with a third argument that appears only in Goitia's Reply. There, Goitia contends that we cannot exercise jurisdiction over him because the Government hasn't shown that his drug-

trafficking activities were connected in some way to the United States. We address each argument in turn.

## I.       The Facial Challenge

The Defendants rely on *United States v. Dávila-Reyes*, 23 F.4th 153 (1st Cir. 2022) (withdrawn) (*Dávila-Reyes II*), a now-withdrawn opinion from the First Circuit Court of Appeals, for their position that § 70502(d)(1)(C) of the MDLEA is facially unconstitutional. *See* Motion at 3–8.[3] Parroting the arguments the First Circuit advanced in *Dávila-Reyes II*, the Defendants contend that § 70502(d)(1)(C) "exceeded its authority under the Felonies Clause when it enacted this provision of the MDLEA because § 70502(d)(1)(C) plainly applies to vessels that are not stateless under customary international law." *Id.* at 3 (quoting *Dávila-Reyes II* at 153). Like all our district-court colleagues, we now decline the Defendants' invitation to follow *Dávila-Reyes II*.

### A.       The Legal Framework

The Constitution vests Congress with the power "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations[.]" U.S. CONST. art. I, § 8, cl. 10. "The Supreme Court has interpreted that Clause to contain three distinct grants of power: to define and punish piracies, to define and punish felonies committed on the high seas, and to define and punish offenses against the law of nations." *United States v. Campbell*, 743 F.3d 802, 805 (11th Cir. 2014) (citation omitted).[4] Clause 10 thus consists of three provisions—the Piracies Clause, the Felonies

---

[3] The First Circuit initially upheld this provision's constitutionality. *See United States v. Dávila-Reyes*, 937 F.3d 57, 62 (1st Cir. 2019) (withdrawn) (*Dávila-Reyes I*) (upholding the constitutionality of the "MDLEA [as] consistent with the 'protective principle' of international law"). The panel only withdrew that initial decision after concluding that a subsequent First Circuit case—not binding in our Circuit—"diminished the force of [that] circuit's precedent on the protective principle." *Dávila-Reyes II* at 157.

[4] *See also United States v. Smith*, 18 U.S. (5 Wheat.) 153, 158–59 (1820) ("The constitution declares, that Congress shall have power 'to define and punish piracies and felonies committed on the high seas, and offences against the law of nations.' . . . The power given to Congress is not merely 'to define and punish piracies;' if it were, the words 'to define,' would seem almost superfluous, since the power to punish piracies would be held to include the power of ascertaining and fixing the definition of the

Clause, and the Offenses Clause. *See United States v. Alfonso*, No. 21-cr-20306-CMA (S.D. Fla. Nov. 22, 2021) (Altonaga, C.J.), ECF No. 47 at 4 (distinguishing between each of these sub-clauses).[5]

Congress enacted the MDLEA to address the "serious international problem" of drug trafficking aboard vessels, which "presents a specific threat to the security and societal well-being of the United States." *Estupinan*, 453 F.3d at 1338. The MDLEA makes it unlawful for any person "on board a covered vessel . . . [to] knowingly or intentionally . . . manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance." 46 U.S.C. § 70503(a)(1). The MDLEA's prohibitions apply "even though the act is committed outside the territorial jurisdiction of the United States," *id.* § 70503(b), and "a covered vessel" includes any "vessel subject to the jurisdiction of the United States," *id.* § 70503(e)(1). As relevant here, the MDLEA defines "vessel subject to the jurisdiction of the United States" to include, among other things, any "vessel without nationality." *Id.* § 70502(c)(1)(A).

A vessel is considered "without nationality" under the MDLEA—and thus "subject to the jurisdiction of the United States"—in any of three situations: (1) when the master makes a claim of registry, but the nation in question denies the claim, *id.* § 70502(d)(1)(A); (2) when "the master or individual in charge fails," in response to questioning by U.S. law enforcement, "to make a claim of nationality or registry for th[e] vessel," *id.* § 70502(d)(1)(B); or (3) when the country of claimed registry

---

crime. . . . But the power is also given 'to define and punish felonies on the high seas, and offences against the law of nations.' The term 'felonies,' has been supposed in the same work, not to have a very exact and determinate meaning in relation to offences at the common law committed within the body of a county. . . . [T]here is a peculiar fitness in giving the power to define as well as to punish; and there is not the slightest reason to doubt that this consideration had very great weight in producing the phraseology in question.").

[5] *See also United States v. Dávila-Mendoza*, 972 F.3d 1264, 1268 (11th Cir. 2020) (describing U.S. CONST. art. I, § 8, cl. 10 as a "tripartite clause"); *but see United States v. Estupinan*, 453 F.3d 1336, 1338 (11th Cir. 2006) (noting Congress's "authority under the *Piracies and Felonies Clause* in enacting" the MDLEA (emphasis added)). When considered together, the "Piracies and Felonies Clause" is sometimes referred to as the "Define and Punish Clause." *See generally* Eugene Kontorovich, *The "Define and Punish" Clause and the Limits of Universal Jurisdiction*, 103 NW. U. L. REV. 149 (2000).

"does not affirmatively and unequivocally assert that the vessel is of its nationality," *id.* §
70502(d)(1)(C). This last scenario is the one at issue here.

### B. *Dávila-Reyes II*

In *Dávila-Reyes II*, the First Circuit struck down § 70502(d)(1)(C) as facially unconstitutional.
That case "ar[o]se from the U.S. Coast Guard's interdiction of a small speed boat in the western
Caribbean Sea and the subsequent arrest and indictment of the three men on board for drug trafficking
under the [MDLEA.]" *Dávila-Reyes II* at 157. As here, the defendants filed a motion to dismiss the
indictment, "argu[ing] that [§ 70502(d)(1)(C) of the MDLEA], which in certain circumstances allows
U.S. law enforcement to arrest and prosecute foreign nationals for drug crimes committed in
international waters, exceeds Congress's authority under Article I of the Constitution." *Ibid.*
Specifically, they contended (as our Defendants do) "that their prosecution was unlawful because their
vessel was not properly deemed stateless"—in other words, that the MDLEA "expands the definition
of a 'vessel without nationality' beyond the bounds of international law and thus unconstitutionally
extends U.S. jurisdiction to foreigners on foreign vessels." *Id.* at 158. The district court denied the
motion, and (initially) the First Circuit affirmed on the ground that "our governing precedent
concerning the protective principle of international law . . . permit[ted] prosecution under the MDLEA
even of foreigners on foreign vessels." *Dávila-Reyes I* at 59. When the defendants moved for rehearing
and en banc review, the First Circuit "held their requests in abeyance pending the en banc decision in
another drug-trafficking case involving a constitutional challenge" to the MDLEA. *Dávila-Reyes II* at
157 (citing *United States v. Aybar-Ulloa*, 987 F.3d 1 (1st Cir. 2021) (en banc)). "[B]ased on [the *Dávila-
Reyes II* panel's] view that the decision in *Aybar-Ulloa* diminished the force of [the First Circuit's]
precedent on the protective principle, the [panel] concluded that it would no longer be appropriate to

rely on that principle to uphold appellants' convictions" and "granted panel rehearing to address appellants' constitutional challenge to their prosecution under the MDLEA." *Ibid.* (cleaned up).

The *Dávila-Reyes II* panel then laid out the facts of the case:

> In October 2015, while patrolling waters approximately 30 nautical miles southeast of San Andrés Island, Colombia, U.S. Coast Guard officers observed a small vessel moving at a high rate of speed. When the occupants of the vessel became aware of the Coast Guard boat nearby, they began throwing packages and fuel barrels overboard. The Coast Guard officers approached the boat and began to question its occupants, the two appellants and a third co-defendant. Reyes-Valdivia, as the "master" of the vessel, claimed Costa Rican nationality for the vessel but did not provide any documentation to support that claim.

> The Coast Guard officers boarded and searched the vessel pursuant to a provision of an agreement between the United States and Costa Rica "Concerning Cooperation to Suppress Illicit Traffic." The officers did not find any contraband, but a chemical test detected traces of cocaine. Based on that evidence, the Coast Guard detained the three men—all citizens of Costa Rica—and took them to the U.S. Naval Base at Guantánamo Bay, Cuba, and then eventually to Puerto Rico. At some point, the United States contacted the government of Costa Rica requesting confirmation of the vessel's registry or nationality, and Costa Rica subsequently responded that it could not confirm the vessel's registry. The United States thus determined that, pursuant to § 70502(d)(1)(C) of the MDLEA, the boat was "without nationality" and subject to U.S. jurisdiction.

*Id.* at 158–59 (cleaned up).

The court began its analysis by noting (as we've suggested) that "statements in both the majority and concurring opinions in *Aybar-Ulloa*"—a recent en banc decision of the First Circuit— "more directly suggest skepticism about applying the protective principle to a foreign vessel whose occupants are foreign nationals allegedly involved in drug trafficking, at least absent acquiescence by the flag nation." *Id.* at 160. The panel added that it saw "in *Aybar-Ulloa* multiple signals that the majority of judges on our court do not view the protective principle as supporting U.S. jurisdiction over drug-trafficking activity conducted on the high seas by foreign nationals on foreign vessels." *Id.* at 161. The court thus "decline[d] to rely on the protective principle to uphold appellants' convictions." *Ibid.* Let's plant a flag in this opening analytical gambit because (as we'll soon see) it's the first and most obvious reason for our holding that *Dávila-Reyes II* doesn't apply here.

The panel then said something else interesting: "Despite the frequency with which MDLEA cases arise in this circuit, waiver and other threshold procedural issues have prevented us from fully addressing the merits of a challenge under Article I to any portion of the MDLEA." *Id.* at 170–71. Note this comment, too, because it's a second important way in which First Circuit law differs from ours. In any case, the panel proceeded to outline the legal question:

> [A]ppellants contend that § 70502(d)(1)(C) of the MDLEA defines "vessel without nationality" to encompass vessels—including their own—that are not in fact without nationality under international law. A conflict exists, they explain, because the provision treats a vessel as stateless despite a claim of nationality being made through a method long acceptable under international law—specifically, in their case, the master's verbal claim—if the named country does not "affirmatively and unequivocally assert that the vessel is of its nationality." 46 U.S.C. § 70502(d)(1)(C). In other words, appellants maintain that § 70502(d)(1)(C) rejects a claim of nationality in circumstances where international law accepts the claim. According to appellants, because of this disconnect between the MDLEA and international law, U.S. authorities who rely on the definition of a "vessel without nationality" contained in § 70502(d)(1)(C) will impermissibly arrest and prosecute foreign nationals on a foreign vessel—which is what they say occurred in this case.

> Appellants' assertion of improper arrest and prosecution depends on two propositions involving international law: first, that Congress's authority to "define and punish . . . Felonies committed on the high Seas," U.S. Const. art. I, § 8, cl. 10, is limited by principles of international law and, second, that § 70502(d)(1)(C) allows the United States to deem vessels stateless even when they would not be deemed stateless under international law. If both propositions are correct, § 70502(d)(1)(C) would unconstitutionally permit U.S. authorities to assert jurisdiction over vessels that would not be stateless under international law.

*Id.* at 173.

After citing some Founding-era blandishments about the extent to which *some* of the Framers *might* have cared to *some* degree about international affairs, the panel found "it apparent that the Framers viewed international law as a restraint on Congress's enumerated powers bearing on foreign relations." *Id.* at 176. As we've hinted, these general statements from the Framers suggest nothing of the sort. Turning to the Felonies Clause, though, the court noted that "[t]he separate references to 'Piracies' and 'Felonies' inescapably reflects the Framers' view that Congress's power over each

category was meant to be distinct." *Id.* at 178. And what was that distinction? Well, the panel explained, piracy meant (at the Founding) "robbery upon the sea" and constituted "a crime of 'universal jurisdiction,' meaning that it can be punished by any country no matter where it is committed or by whom." *Ibid.* (cleaned up). Thus, the court concluded, "by separating the term 'Piracies' from 'Felonies,' the Framers plainly intended to refer to the specific crime that, under international law, could be punished by Congress even when it was committed by foreign nationals on foreign vessels." *Id.* at 179. This, of course, doesn't follow and isn't at all plain—as we explain in much more detail below.

Still, the court pushed on: "Just as plainly," it said, "the phrase 'Felonies committed on the high Seas' was intended to reference other types of serious crimes committed on vessels." *Ibid.* And, it explained, "[a]t the time, it was a well-accepted principle of international law that countries could enact statutes criminalizing conduct on the high seas other than piracy, but only as to a given country's own nationals or on vessels over which the country could exercise jurisdiction pursuant to international law." *Ibid.* All of which led the court to the following findings:

> [T]here can be no doubt that the Constitution's drafters intended that Congress's authority under the Define and Punish Clause, including the Felonies portion of it, be constrained by currently applicable international law whenever Congress invokes that Clause to assert its authority over foreign nationals and their vessels on the high seas. The Framers sought to ensure that Congress would respect the sovereignty of other nations, and the limits placed on the prosecution of other countries' nationals is an essential component of the international system of mutual respect. Necessarily, then, that constraint applies when Congress passes legislation deeming vessels on the high seas stateless. If the Constitution instead permitted Congress to define a vessel as stateless in any way it wished, there would be a risk that Congress could contravene international norms determining when a country may prosecute felonies committed by foreign nationals on the high seas. It therefore follows that the Felonies Clause requires Congress to abide by international law principles in defining statelessness.

*Id.* at 183.

Turning to the MDLEA, the court found that two of its three provisions "are clearly consistent with international law"—specifically, the provisions that apply "when the nation whose registry is

claimed denies the claim, *id.* § 70502(d)(1)(A), and when the individual in charge of a vessel fails to make a claim of nationality or registry for the vessel upon request of an authorized United States officer, *id.* § 70502(d)(1)(B)." *Id.* at 187. "The third definition, however—the one at issue here—allows a vessel to be treated as stateless where there is a claim of nationality recognized by international law but the identified country neither confirms nor denies that claim." *Ibid.*

The panel then determined that "international law recognizes that an oral claim by the vessel's master constitutes prima facie proof of the vessel's nationality." *Id.* at 186. For this proposition, it cited several old cases that don't actually say this—and which don't purport to survey the state of current international law in any event. Anyway (the court said), the third provision—the one that "treats a response . . . that the named country is unable to confirm nationality . . . as evidence that is equivalent to an outright denial of a master's claim of" registry—"displaces the prima facie showing of nationality that arises from an oral assertion of nationality or registry . . . without any affirmative evidence to the contrary." *Id.* at 187. In doing so, the court felt, this provision violates international law. *Id.* at 193 ("[A]s we have described, even where the circumstances offer no rationale for displacing the prima facie showing of nationality established through a verbal claim, § 70502(d)(1)(C) treats a vessel as stateless based solely on the named country's failure to respond 'affirmatively and unequivocally' to U.S. inquiry. The statute on its face is thus inconsistent with international law[.]"). And, by violating international law (the panel said), the provision also violates the Constitution. *Id.* at 195 ("Accordingly, the prosecution of foreign nations traveling on such a vessel for a violation of U.S. law is impermissible under the Felonies Clause of the Constitution, the only source of authority asserted for Congress's adoption of the MDLEA.").

On July 5, 2022, the First Circuit vacated and withdrew the panel's decision in *Dávila-Reyes II* and agreed to take the case en banc. *See United States v. Dávila-Reyes*, 38 F.4th 288 (1st Cir. 2022). The panel's holding in *Dávila-Reyes II* is thus no longer good law in the First Circuit (or anywhere else). *See*

*Backman v. Polaroid Corp.*, 910 F.2d 10, 14 (1st Cir. 1990) (noting that, when a court of appeals grants rehearing en banc, the "[panel] opinion no longer has standing, except to the extent that [the en banc court] adopt[s] it" (cleaned up)).

    **C.**    **We Refuse to Follow *Dávila-Reyes II***

For four reasons, we refuse to follow *Dávila-Reyes II*.

*First*, contra the law in the First Circuit, the "protective principle" is alive and well here in the Eleventh Circuit. Under that principle, "the United States [may] exercise[ ] jurisdiction to prescribe law with respect to . . . certain conduct outside its territory by persons not its nationals or residents that is directed against the security of the United States or against a limited class of other fundamental U.S. interests[.]" Restatement (Fourth) of Foreign Relations § 402 (2018). The protective principle is thus "the right of a state to punish a limited class of offenses committed outside its territory by persons who are not its nationals—offenses threatening the integrity of governmental functions that are generally recognized as crimes by developed legal systems." Restatement (Third) of Foreign Relations § 402, cmt. f (1987); *cf. Estupinan*, 453 F.3d at 1339 (noting that "the trafficking of narcotics is condemned universally by law-abiding nations").

And, unlike the First Circuit, the Eleventh Circuit has explicitly held that the protective principle authorized Congress, through the MDLEA, to exercise jurisdiction over foreign nationals who traffic drugs on the high seas. *See, e.g.*, *Campbell*, 743 F.3d at 810 (recognizing that "the conduct proscribed by the [MDLEA] need not have a nexus to the United States because universal and protective principles support its extraterritorial reach"); *United States v. Saac*, 632 F.3d 1203, 1210 (11th Cir. 2011) ("In examining the constitutionality of the MDLEA, we concluded that the statute's extraterritorial reach was justified under the universal principle of international law. According to this principle, a nation may pass laws to define and punish certain crimes considered to be of universal concern."); *United States v. Tinoco*, 304 F.3d 1088, 1108 (11th Cir. 2002) ("[W]e [previously] noted that

Congress, under the protective principle of international law, may assert extraterritorial jurisdiction over vessels in the high seas that are engaged in conduct that has a potentially adverse effect and is generally recognized as a crime by nations that have reasonably developed legal systems."); *United States v. Persaud*, 605 F. App'x 791, 795 (11th Cir. 2015) ("We [have] also recognized that the conduct proscribed by the [MDLEA] need not have a nexus to the United States because universal and protective principles support its extraterritorial reach."). In fact, our Circuit has deployed the protective principle to uphold Congress's exercise of extraterritorial jurisdiction in the context of *other* drug-trafficking statutes. *See, e.g.*, *Saac*, 632 F.3d 1203, 1211 ("Congress's findings show that the [Drug Trafficking Vessel Interdiction Act of 2008, 18 U.S.C. § 2285] targets criminal conduct that facilitates drug trafficking, which is condemned universally by law-abiding nations. Given Congress's findings, the protective principle of international law provides an equally compelling reason to uphold the DTVIA. Under that principle, a nation may assert jurisdiction over a person whose conduct outside the nation's territory threatens the nation's security or could potentially interfere with the operation of its governmental functions." (cleaned up)).

Nor are we alone in reading the precedents this way. *See United States v. Waters*, 2022 WL 1224728, at *3 n.1 (S.D. Fla. Apr. 26, 2022) (Scola, J.) ("This Court is not aware of a similar diminishment of the protective principle in this Eleventh Circuit [as compared with the First Circuit]; rather, . . . the Eleventh Circuit has frequently cited to the protective principle as a basis for the MDLEA."); *Barros*, 2022 WL 1135707, at *3 ("In contrast, the Eleventh Circuit has repeatedly justified the MDLEA's assertion of jurisdiction over foreign nationals trafficking drugs on the high seas by expressly referencing the United States' rights under the protective principle."); Order Denying Motion to Dismiss, *United States v. Aguilar-Hurtado, et al.*, No. 22-cr-20050-CMA (S.D. Fla. May 5, 2022) (Altonaga, C.J.), ECF No. 38 at 5 ("[T]he Eleventh Circuit has repeatedly upheld the MDLEA's extraterritorial reach over foreign nationals trafficking drugs on the high seas under the protective

principle of international law.”); Order Denying Motion to Dismiss, *United States v. Angelo Martinez, et al.*, No. 22-cr-20040-JEM (S.D. Fla. May 9, 2022) (Martinez, J.), ECF No. 28 at 7 (“[C]aselaw is legion in the Eleventh Circuit that the MDLEA’s extraterritoriality is supported by the protective principle.” (cleaned up)).

This is a crucial distinction between the law that governs us here in the Eleventh Circuit and the law that applied in *Dávila-Reyes II*. Recall that the First Circuit originally upheld the MDLEA’s constitutionality on the ground that “our governing precedent concerning the protective principle of international law . . . permit[ted] prosecution under the MDLEA even of foreigners on foreign vessels.” *Dávila-Reyes I* at 59. When the defendants moved for rehearing and en banc review, the First Circuit “held their requests in abeyance pending the en banc decision in another drug-trafficking case involving a constitutional challenge” to the MDLEA. *Dávila-Reyes II* at 157 (citing *Aybar-Ulloa*, 987 F.3d 1). And it was only “based on [*Dávila-Reyes II*’s] view that the decision in *Aybar-Ulloa* diminished the force of [the First Circuit’s] precedent on the protective principle” that the panel concluded “it would no longer be appropriate to rely on that principle to uphold appellants’ convictions[.]” *Ibid.* (cleaned up). But, as every judge in our Circuit who has considered this issue has said: We’re “not aware of a similar diminishment of the protective principle in the Eleventh Circuit”—mainly because “the Eleventh Circuit has frequently cited to the protective principle as a basis for the MDLEA.” *United States v. De Leon Berroa*, 2022 WL 1166535, at *3 n.1 (S.D. Fla. Apr. 20, 2022) (Scola, J.); *see also, e.g.*, *United States v. Canario-Vilomar*, 2022 WL 1450032, at *5 n.3 (S.D. Fla. May 9, 2022) (Bloom, J.) (rejecting an effort by the defendants in that case to distinguish Eleventh Circuit precedent on the protective principle and reasoning that, “[i]f the United States’ jurisdictional reach under the protective principle extends to include foreign vessels, then logically the United States can prosecute foreign

nationals on vessels purported to be of foreign nationality but whose nationality cannot be confirmed").[6]

***

*Second*, unlike the First Circuit, the Eleventh Circuit has made clear that Congress *was* authorized, under the Felonies Clause, to pass the MDLEA. Remember what *Dávila-Reyes II* said about this: "Despite the frequency with which MDLEA cases arise in this circuit, waiver and other threshold procedural issues have prevented us from fully addressing the merits of a challenge under Article I to any portion of the MDLEA." *Dávila-Reyes II* at 170–71. That isn't true in our Circuit. The MDLEA, our Circuit has held, "was enacted under Congress's authority provided by the Felonies Clause . . . to define and punish felonies committed on the high seas." *United States v. Cruickshank*, 837 F.3d 1182, 1187 (11th Cir. 2016). Indeed, while the Eleventh Circuit has held that the MDLEA falls "outside of the power of Congress under the *Offences Clause*" when applied to drug trafficking in the territorial waters of another nation, it "ha[s] *always* upheld extraterritorial convictions under our drug trafficking laws as an exercise of power under the *Felonies Clause*." *United States v. Bellaizac-Hurtado*, 700 F.3d 1245, 1249, 1257 (11th Cir. 2014) (emphases added & cleaned up). That's not surprising because the Eleventh Circuit "ha[s] repeatedly held that Congress has the power, under the Felonies Clause, to proscribe drug trafficking on the high seas." *Campbell*, 743 F.3d at 812; *see also Estupinan*, 453 F.3d at 1339 ("[W]e readily hold that the district court committed no error in failing to *sua sponte* rule that Congress exceeded its authority under the Piracies and Felonies Clause in enacting the MDLEA."). In

---

[6] There's also a strong argument that the protective principle isn't as "diminished" in the First Circuit as *Dávila-Reyes II* suggested. *See* Petition of the United States for Rehearing En Banc at 14–15, *United States v. Dávila-Reyes*, 23 F.4th 153 (1st Cir. 2022) (withdrawn) (Nos. 16-2089 and 16-2143) (citing *United States v. Bravo*, 489 F.3d 1, 7–8 (1st Cir. 2007), *United States v. Vilches-Navarrete*, 523 F.3d 1, 21–22 (1st Cir. 2008), and *United States v. Cardales*, 168 F.3d 548, 553 (1st Cir. 1999), for the proposition that the protective principle is still good law in the First Circuit too). But that's neither here nor there. We accept *Dávila-Reyes II*'s supposition that the First Circuit has done away with the protective principle and find that to be a dispositive distinction between that circuit's jurisprudence and our own.

other words, the Eleventh Circuit has (time and again) reaffirmed the constitutionality of the MDLEA as a valid exercise of Congress's power under the Felonies Clause—the very same proposition the now-withdrawn opinion in *Dávila-Reyes II* rejected.[7]

The Defendants insist that *Campbell* doesn't foreclose their jurisdictional challenge because the defendant in that case didn't raise the *precise* constitutional argument they advance here. *See* Goitia's Reply at 4. Even if that's true, the decisions we've cited here strongly support the Government's view that, under the law of this Circuit, Congress was authorized to pass the MDLEA.

The defendant in *Campbell* challenged his conviction under the MDLEA after he and others were caught illegally transporting marijuana in international waters. 743 F.3d at 804. The defendant claimed that his vessel—which bore no flag or registration number—was registered in Haiti, but that country refused to confirm or deny his claim. *Id.* at 804–05. The *Campbell* defendant "challenge[d] his conviction on five grounds, four of which attack[ed] the constitutionality" of the MDLEA. *Id.* at 806. In one of these, the defendant "argue[d] that Congress exceeded its authority under the Felonies Clause when it enacted the [MDLEA] because his drug trafficking offense lacked any nexus to the United States and because drug trafficking was not a capital offense during the Founding era[.]" *Id.* at 809–10. In a section titled "The Act Is a Constitutional Exercise of Congressional Power under the Felonies Clause," the Eleventh Circuit said: "'[W]e have always upheld extraterritorial convictions under our drug trafficking laws as an exercise of power under the Felonies Clause.'" *Id.* at 810 (quoting *Bellaizac–Hurtado*, 700 F.3d at 1257). "And," it added, "we have long upheld the authority of Congress to 'extend[ ] the criminal jurisdiction of this country to any stateless vessel in international waters

---

[7] *See Dávila-Reyes II* at 194–95 ("What the United States cannot do consistently with the Constitution, however, is arrest and prosecute foreigners on foreign vessels by relying on a concept of statelessness that conflicts with international law. And that is what § 70502(d)(1)(C) allows. . . . [T]he MDLEA treats as stateless a vessel that, under international law, would be a vessel <u>with</u> nationality. Accordingly, the prosecution of foreign nations traveling on such a vessel for a violation of U.S. law is impermissible under the Felonies Clause of the Constitution, the only source of authority asserted for Congress's adoption of the MDLEA.").

engaged in the distribution of controlled substances.'" *Ibid.* (quoting *United States v. Marino–Garcia*, 679 F.2d 1373, 1383 (11th Cir. 1982)). "Moreover," it continued, "in *United States v. Estupinan*, we rejected an argument 'that Congress exceeded its authority under the Piracies and Felonies Clause in enacting the [MDLEA].'" *Ibid.* (quoting *Estupinan*, 453 F.3d at 1338). Then, deploying the protective principle, the court said that "Congress may assert extraterritorial jurisdiction over vessels in the high seas that are engaged in conduct that has a potentially adverse effect and is generally recognized as a crime by nations that have reasonably developed legal systems." *Ibid.* (cleaned up). That's because "[t]he protective principle does not require that there be proof of an actual or intended effect inside the United States." *Ibid.* (cleaned up). Highlighting this point, the court said that "stateless vessels, such as the one Campbell boarded, are international pariahs that have no internationally recognized right to navigate freely on the high seas." *Ibid.* (cleaned up).

It's true (as Goitia points out) that the *Campbell* defendant didn't raise the specific constitutional challenge we have here—*viz.*, that the MDLEA violates the Felonies Clause because it authorizes Congress to apply a definition of "stateless vessel" that doesn't conform to international norms. *See* Goitia's Reply at 4 ("[*Campbell*] stand[s] for a completely different proposition, that is, that Congress did not exceed its authority by allowing for jurisdiction to be secured without a foreign nation having to affirmatively confirm or deny that a vessel is of its nationality[.]"). Still, *Campbell*'s broad and uncompromising pronouncements—including and especially its reading of *Estupinan* as explicitly rejecting any claim that Congress, in enacting the MDLEA, exceeded its authority under the Felonies Clause—are impossible for us to ignore. *Cf. In re Lambrix*, 776 F.3d 789, 794 (11th Cir. 2015) ("We have held that a prior panel precedent cannot be circumvented or ignored on the basis of arguments not made to or considered by the prior panel. . . . In short, we have categorically rejected an overlooked reason or argument exception to the prior-panel precedent rule." (cleaned up)). Indeed, as *Campbell* made plain, our Circuit has "always upheld" the MDLEA as a proper exercise of

Congress's authority under the Felonies Clause. *See, e.g.*, *Bellaizac-Hurtado*, 700 F.3d at 1257 ("[W]e have always upheld extraterritorial convictions under our drug trafficking laws as an exercise of power under the Felonies Clause."); *Estupinan*, 453 F.3d at 1338 (rejecting the argument "that Congress exceeded its authority under the Piracies and Felonies Clause in enacting the [MDLEA]"); *Marino-Garcia*, 697 F.2d at 1383 (affirming Congress's authority "to extend[ ] the criminal jurisdiction of this country to any stateless vessel in international waters engaged in the distribution of controlled substances").

Time and again, in short, our Circuit has reaffirmed the constitutionality of the very same provision of the MDLEA the Defendants challenge here, under the very same Felonies Clause the Defendants rely on here, in the face of jurisdictional attacks stemming from the very same criminal conduct our Defendants are accused of here. As several of our judges have said: "[T]he Eleventh Circuit instructs courts that 'overlooked reason[s] or argument[s]' do not create an excuse to overlook the binding authority of precedent." *Barros*, 2022 WL 1135707, at *5 (quoting *In re Lambrix*, 776 F.3d at 794); *see also Aguilar-Hurtado*, No. 22-cr-20050-CMA, ECF No. 38 at 6 ("The Court declines Defendants' invitation to overlook binding precedent establishing the constitutionality of the MDLEA." (cleaned up)).

***

*Third*, every judge in our Circuit who's considered this question has rejected the Defendants' position. *See, e.g.*, *United States v. Caraballo*, 2022 WL 2160699, at *5 (S.D. Fla. May 12, 2022) (Torres, Mag. J.) ("In light of this binding precedent establishing the constitutionality of the MDLEA, we cannot find that Congress exceeded its grant of authority under the Felonies Clause by enacting § 70502(d)(1)(C). This is a conclusion that has been unanimously adopted by all cases in our circuit analyzing this constitutional question post-*Dávila-Reyes*" (cleaned up)), *report and recommendation adopted*, 2022 WL 215832 (Gayles, J.); *Canario-Vilomar*, 2022 WL 1450032, at *5 ("Eleventh Circuit precedent establishes that Congress did not overstep its authority in enacting the MDLEA under the Felonies

Clause by violating international law because the protective principle of international law permits MDLEA's conferral of jurisdiction over vessels whose nationality cannot be confirmed. As such, [the] Defendants' Motion is denied as to this matter[.]"); *United States v. Grueso*, 2022 WL 1650098, at *6 (S.D. Fla. May 2, 2022) (Torres, Mag. J.) ("In light of this binding precedent establishing the constitutionality of the MDLEA, we cannot find that Congress exceeded its grant of authority under the Felonies Clause by enacting § 70502(d)(1)(C)." (cleaned up)), *report and recommendation adopted*, 2022 WL 164104 (Gayles, J.); *Waters*, 2022 WL 1224728, at *3 ("As the Eleventh Circuit has repeatedly upheld the MDLEA as a valid exercise of power pursuant to the Felonies Clause, in accordance with international law, the Court applies this precedent and rejects the Defendants' facial challenge to the constitutionality of § 70502(d)(1)(C)."); *United States v. Mendez*, 2022 WL 1202889, at *5 (S.D. Fla. Apr. 21, 2022) (Bloom, J.) ("[T]he Court declines Defendants' invitation to overlook binding precedent establishing the constitutionality of the MDLEA and to instead rely on Defendants' presumption that the Eleventh Circuit did not fully consider an additional argument that purportedly renders the MDLEA unconstitutional."); *De Leon Berroa*, 2022 WL 1166535, at *4 ("As the Eleventh Circuit has repeatedly upheld the MDLEA as a valid exercise of power pursuant to the Felonies Clause, in accordance with international law, the Court applies this precedent and rejects the Defendants' facial challenge to the constitutionality of § 70502(d)(1)(C)."); *Barros*, 2022 WL 1135707, at *5 ("Eleventh Circuit precedent establishes that Congress did not overstep its authority in enacting the MDLEA under the Felonies Clause by violating international law because the protective principle of international law permits MDLEA's conferral of jurisdiction over vessels whose nationality cannot be confirmed."); *United States v. Urbina*, 2022 WL 1171366, at *1 (M.D. Fla. Apr. 20, 2022) (Barber, J.) ("[T]he Eleventh Circuit has always upheld extraterritorial convictions under our drug trafficking laws as an exercise of power under the Felonies clause. Accordingly, the motion [to dismiss the indictment] is denied."); *United States v. Anchundia*, 2022 WL 855561, at *3 (S.D. Ala. Mar. 22, 2022) (DuBose, J.)

("[T]he Eleventh Circuit has determined that whether a vessel is stateless under international law is not an issue to be determined by the courts. Rather, because it is a proper exercise of power under the Constitution for Congress to define a stateless vessel, courts look only to the definition as provided by the statute.").[8]

Normally, we wouldn't rely on district-court decisions this way. But, when defense lawyers around the Circuit engage in a concerted effort to advance a specific legal challenge to a statute *whenever* that statute is charged, we'd expect (if the question were close) to see some disagreement among the lower courts. It's therefore probative in our view that our district court colleagues around this Circuit have so uniformly rebuffed the Defendants' position. Indeed, now that the First Circuit has withdrawn *Dávila-Reyes II*, there are no cases, *anywhere in the country*, that take the Defendants' view.[9] This unanimity in the lower courts is further evidence that the Defendants' constitutional arguments are misplaced.

\*\*\*

*Fourth*, *Dávila-Reyes II* was, for four reasons, wrongly decided.

---

[8] Nor do we expect the Eleventh Circuit to take the Defendants' side of this debate. *See United States v. Mina-Salazar*, 2022 WL 1157583, at \*2 (11th Cir. Apr. 19, 2022) (per curiam) (refusing to allow a defendant to advance, in supplemental briefing, a new argument based on *Dávila-Reyes II* and describing that opinion as "[a] non-binding decision from a sister circuit").

[9] Westlaw shows fifteen cases citing to *Dávila-Reyes II*. Of those fifteen, eleven are decisions from judges in our Circuit who've refused to follow *Dávila-Reyes II*. *See Mina-Salazar*, 2022 WL 1157583, at \*2; *Anchundia*, 2022 WL 855561, at \*3; *Barros*, 2022 WL 1135707, at \*4–5; *Canario-Vilomar*, 2022 WL 1450032, at \*4–5; *Caraballo*, 2022 WL 2160699, at \*4; *De Leon Berroa*, 2022 WL 1166535, at \*3; *Grueso*, 2022 WL 1650098, at \*4; *Mendez*, 2022 WL 1202889, at \*4–5; *Waters*, 2022 WL 1224728, at \*2; *Urbina*, 2022 WL 1171366, at \*1; *United States v. Pierre et al.*, 2022 WL 3042244, at \*19 (S.D. Fla. Aug. 1, 2022) (Altman, J.). The other four are cases from the District of Puerto Rico. Interestingly, while Puerto Rico is in the First Circuit, those judges all found *Dávila-Reyes II* inapposite on their facts. *See United States v. Gutiérrez-Moreno*, 2022 WL 2827462, at \*7 (D. P.R. July 20, 2022); *United States v. Salazar-Guerra*, 2022 WL 2193479, at \*2 (D. P.R. June 17, 2022); *United States v. Valentín*, 2022 WL 2339416, at \*3 (D. P.R. June 29, 2022). Indeed, as far as we can tell, every other circuit court that has considered the question has upheld the constitutionality of the MDLEA. *See United States v. Moreno-Morillo*, 334 F.3d 819, 824 (9th Cir. 2003) (holding that, "[a]s an exercise of congressional power pursuant to Article I, Section 8, Clause 10, this court clearly has held that the MDLEA is constitutional"). In short, we've found no authority for the Defendants' position besides the now-withdrawn decision in *Dávila-Reyes II*.

*One*, the Felonies Clause isn't cabined by international law. The "duty [of federal courts] is to enforce the Constitution, laws, and treaties of the United States, not to conform the law to norms of customary international law." *United States v. Yunis*, 924 F.2d 1086, 1091 (D.C. Cir. 1991). "Statutes inconsistent with principles of customary international law may well lead to international law violations. But within the domestic legal realm, that inconsistent statute simply modifies or supersedes customary international law to the extent of the inconsistency." *Comm. of U.S. Citizens Living in Nicar. v. Reagan*, 859 F.2d 929, 938 (D.C. Cir. 1988). "After all, Congress is not bound by international law, so it may legislate with respect to conduct outside the United States, in excess of the limits posed by international law." *United States v. Ballestas*, 795 F.3d 137, 144 (D.C. Cir. 2015) (cleaned up); *see also Bellaizac-Hurtado*, 700 F.3d at 1258 (holding that "Congress is not bound by international law"); *United States v. Yousef*, 327 F.3d 56, 86 (2d Cir. 2003) ("Congress is not bound by international law" and "may legislate with respect to conduct outside the United States, in excess of the limits posed by international law.").[10]

The Supreme Court, in fact, has admonished us not to constrain the Constitution by reference to international-law precedents. *See, e.g.*, *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1416 (2018) (Gorsuch, J., concurring) ("While this court has called international law part of our law, and a component of the law of the land, that simply meant international law was no different than the law of torts or contracts—it was part of the so-called general common law, but *not* part of federal law. . . . The text of the Constitution appears to recognize this distinction. Article I speaks of 'Offences against the Law of Nations,' while both Article III and Article VI's Supremacy Clause, which defines the scope of pre-emptive federal law, omit that phrase while referring to the 'Laws of the United States.' Congress may act to bring provisions of international law into federal law, but they cannot

---

[10] *See also Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 814–15 (1993) (Scalia, J., dissenting) (explaining that Congress "clearly has constitutional authority" to confer extraterritorial jurisdiction in violation of international law).

find their way there on their own. 'The law of nations is not embodied in any provision of the Constitution, nor in any treaty, act of Congress, or any authority, or commission derived from the United States.'" (quoting *Caperton v. Bowyer*, 14 Wall. 216, 228 (1872))); *see also Stanford v. Kentucky*, 492 U.S. 361, 370 n.1 (1989) ("We emphasize that it is *American* conceptions of decency that are dispositive, rejecting the contention of petitioners and their various *amici . . .* that the sentencing practices of other countries are relevant." (cleaned up)); *cf. Roper v. Simmons*, 543 U.S. 551, 624–628 (2005) (Scalia, J., dissenting) ("More fundamentally, however, the basic premise of the Court's argument—that American law should conform to the laws of the rest of the world—ought to be rejected out of hand.").

And, while "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains," *Murray v. Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804), this "*Charming Betsy* Doctrine" is a canon of *statutory* construction—not a *constitutional* limitation on Congress's authority. So, "if 'a statute makes plain Congress's intent,' a court 'must enforce the intent of Congress irrespective of whether the statute conforms to customary international law.'" *Ballestas*, 795 F.3d at 143–44 (quoting *Yousef*, 327 F.3d at 93); *see also United States v. Howard-Arias*, 679 F.2d 363, 371–72 (4th Cir. 1982) ("[I]nternational law must give way when it conflicts with or is superseded by a federal statute . . . and the United States may violate international law principles in order to effectively carry out this nation's policies." (cleaned up)); *Alvarez-Mendez v. Stock*, 941 F.2d 956, 963 (9th Cir. 1991) ("[Courts] are bound by a properly enacted statute, provided it be constitutional, even if that statute violates international law.").

Ignoring all of these precedents, *Dávila-Reyes II* maintained that "[t]he Framers' use of the separate terms 'Piracies' and 'Felonies' [ ] manifests an intent to distinguish between crimes with different jurisdictional limits under international law: classic piracy, which can be punished no matter where committed or by whom, and Felonies, which can be punished only if committed by U.S.

nationals or on vessels subject to U.S. jurisdiction under international law." *Dávila-Reyes II* at 180.[11] Implicit here is the canon against superfluity, which presumes that, "[i]f possible, every word and every provision is to be given effect . . . . None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence." A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174 (2012). The argument hinges on *Dávila-Reyes II*'s position that the *only* way to explain the appearance of both "Piracies" and "Felonies" in Clause 10 is this (supposed) age-old "principle of international law that countries could enact statutes criminalizing conduct on the high seas other than piracy, but only as to a given country's own nationals or on vessels over which the country could exercise jurisdiction pursuant to international law." *Dávila-Reyes II* at 179.

But there's a more basic reason for the Clause's inclusion of both "Piracies" and "Felonies" as crimes Congress could "define and punish." As *Dávila-Reyes II* recognized, at the Founding, piracy could mean several different things. On the one hand, it could mean "robbery upon the sea." *Id.* at 178. On the other, it could mean *other* felonies that happen at sea. *Id.* at 179. In other words, some people viewed piracy as *sui generis*, and some construed it as just a mash-up of various other classes of felonies—all occurring at sea. So, if a group of pirates stopped a ship, boarded it, beat up its crew, killed its captain, robbed its booty, and raped some of its women, some Founding-era citizens might've called what happened "piracy," while others would've referred to it as false imprisonment, trespass, assault, battery, murder, robbery, and rape. And the same was true of felonies. As our Circuit has explained:

---

[11] As we've said, the court also quoted a few Founding-era blandishments about international relations in support of its claim "that the Framers viewed international law as a restraint on Congress's enumerated powers bearing on foreign relations." *Dávila-Reyes II* at 176. But none of the stray comments the panel cited, *see id.* at 174–77—most of which stand for the unsurprising and uncontroversial proposition that the Framers perceived international affairs as important—suggest that the Framers wanted the evanescent whims of future international bodies to act as binding restraints on Congress's power.

At the time of the Founding, there was "ambiguity in the meaning of [a] felony." Will Tress, Unintended Collateral Consequences: Defining Felony in the Early American Republic, 57 Clev. St. L.Rev. 461, 465 (2009). "At common law, [a felony was] an offense for which conviction result[ed] in forfeiture of the defendant's lands or goods (or both) to the Crown, regardless of whether any capital or other punishment [was] mandated." Black's Law Dictionary 651 (8th ed. 2004); *see also* 4 William Blackstone, Commentaries *94 (1769) ("Felony, in the general acceptation of our English law, comprize[d] every species of crime, which occasioned at common law the forfeiture of lands or goods."); Giles Jacob, A New Law Dictionary (10th ed. 1782) (listing types of punishment for felonies at common law, including death, loss of inheritance, and forfeiture of goods and lands). "By the late seventeenth century, felony had come to mean any very serious crime, especially those punishable by death." Eugene Kontorovich, The "Define and Punish" Clause and the Limits of Universal Jurisdiction, 103 Nw. U.L.Rev. 149, 160 (2009) (quoting Blackstone, *supra*, at *94); *see also Jacob*, *supra* ("Felony is distinguished from lighter offenses, in that the punishment of it is death: but not always, for petit larceny is felony, . . . yet it is not punished by death, though it be loss of goods. . . ."). And at the time of the Founding, felony was "a multi-definitional term" with "so many meanings from so many parts of the common law[ ] and so many statutes . . . that it is impossible to know precisely in what sense we are to understand this word." *Tress*, *supra*, at 463, 465 (quoting 6 Nathan Dane, Digest of American Law 715 (1823)); *see* 2 Timothy Cunningham, A New and Complete Law Dictionary (3d ed. 1783) (explaining that, "by the law at this day," felonies included treason, murder, homicide, burning of houses, burglary, robbery, rape, chance-medley, and petit larceny and that punishments for felonies ranged from death and forfeiture of goods and chattels to terms of imprisonment and hard labor). As James Madison explained, in defense of the power of Congress to define felonies on the high seas, the term "felony" has a "loose signification." The Federalist No. 42, at 262 (James Madison) (Clinton Rossiter ed., 1961); *see also United States v. Smith*, 18 U.S. (5 Wheat.) 153, 159, 5 L.Ed. 57 (1820) (acknowledging the "indeterminate" definition of felony under the Felonies Clause).

*Campbell*, 743 F.3d at 811 (cleaned up).

This double-sided confusion about the proper scope of these two words ("Piracies" and "Felonies") accounts for the appearance of both in the enumeration of Congress's powers. In other words, the simplest and most obvious explanation for the inclusion of "Piracies" and "Felonies" in Clause 10 is that the Framers wanted to underscore that, however ambiguously later generations might define the two, Congress was empowered to define and punish *both*. It's therefore unnecessary to accept the First Circuit's jurisdiction-based distinction between "Piracies" and "Felonies" as the *only* way to avoid reading superfluity into Clause 10.

And *our* reading of the Felonies Clause has the added benefit of fitting seamlessly with the text and structure of Clause 10. Recall that Clause 10 distinguishes between "Piracies and Felonies committed on the high Seas," on the one hand, and "Offences against the Law of Nations," on the other. U.S. CONST. art. I, § 8, cl. 10. The latter, of course, references the "Law of Nations"—a powerful indication that the Framers knew how to link constitutional provisions to international norms when they wanted to. And yet, when it came down to writing the Piracies and Felonies Clauses, they chose *not* to include a similar international-law rider. *See Jesner*, 138 S. Ct. at 1416 (Gorsuch, J., concurring) ("While this court has called international law part of our law, and a component of the law of the land, that simply meant international law was no different than the law of torts or contracts—it was part of the so-called general common law, but *not* part of federal law. . . . The text of the Constitution appears to recognize this distinction. Article I speaks of 'Offences against the Law of Nations,' while both Article III and Article VI's Supremacy Clause, which defines the scope of pre-emptive federal law, omit that phrase while referring to the 'Laws of the United States.' Congress may act to bring provisions of international law into federal law, but they cannot find their way there on their own."); *cf. Medellin v. Texas*, 552 U.S. 491, 521–22 (2008) ("The judgments of a number of international tribunals enjoy a different status because of implementing legislation enacted by Congress . . . . Such language demonstrates that Congress knows how to accord domestic effect to international obligations when it desires such a result."); *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest."); *Savage Servs. Corp. v. United States*, 25 F.4th 925, 935 (11th Cir. 2022) ("Congress, in short, knows how to waive sovereign immunity when it wants to. And, unfortunately for Savage, it chose *not* to include these well-hashed sovereign-immunity waivers in the OPA."). The Framers' refusal to link the Felonies Clause to

international law thus leads us to one (and only one) conclusion—that Congress's power under the Felonies Clause is *not* tied to international rules. *See* SCALIA & GARDNER at 107 ("The expression of things implies the exclusion of others (*expressio unius est exclusio alterius*).").[12] The Felonies Clause, in short (like the Piracies Clause), requires only that the targeted felony be committed "on the high Seas"—and it doesn't, as the separate Offenses Clause does, link the outer reaches of Congress's power to the vagaries of international sentiment.

Clause 10's drafting history further bolsters our commonsense reading of the Felonies Clause. At the Constitutional Convention, in discussing whether the term "felonies" was "sufficiently defined" under English common law, James Madison noted that the meaning of a "[f]elony at common law is vague" and that, in any event, "no foreign law should be a standard, further than it is *expressly* adopted [by Congress]." 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 316 (Max Farrand ed., 1911) (emphasis added). In Madison's view: "The proper remedy for all these difficulties was to vest the power proposed by the term 'define' in the Natl. legislature." *Ibid.*[13] That's precisely what Congress (our "Natl. legislature") has done in the MDLEA—and nothing in the Constitution generally (or in Clause 10 specifically) prevented it from doing so.

---

[12] We recognize that "[v]irtually all the authorities who discuss the negative-implication canon emphasize that it must be applied with great caution, since its application depends so much on context." SCALIA & GARNER at 107. Still, we think it appropriate to apply that canon here because the result we draw from its application accords so neatly with the fairest reading of Clause 10's text (and, as we're about to see, with its drafting history).

[13] Given our emphasis on text, one might justifiably wonder why we care what James Madison thought. He was, after all, just one of 55 delegates to the Convention. On close reflection, however, the answer is obvious. As Justice Scalia explained: "I will consult the writings of some men who happened to be delegates to the Constitutional Convention—Hamilton's and Madison's writings in The Federalist, for example. I do so, however, not because they were Framers and therefore their intent is authoritative and must be the law; but rather because their writings . . . display how the text of the Constitution was originally understood. What I look for in the Constitution is precisely what I look for in a statute: the original meaning of the text, not what the original draftsmen intended." A. SCALIA, MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 36 (2d ed. 2018). We add here only that Madison's thoughts on the Felonies Clause *might* carry a little extra weight because *he* proposed it and because *his* proposal was *unanimously* approved by the other delegates. *See* 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 316.

*Two*, even if *Dávila-Reyes II* were right that international law somehow constrains Congress's power under the Felonies Clause, then we should apply the international rule that prevailed at the time the Constitution was ratified. But the First Circuit didn't do that. It held, instead, that "the Define and Punish Clause, including the Felonies portion of it, [is] constrained by *currently applicable* international law whenever Congress invokes that Clause to assert its authority over foreign nationals and their vessels on the high seas." *Dávila-Reyes II* at 183 (emphasis added). We've searched the opinion in vain for a single Founding-era citation for this "currently applicable" proviso. And it isn't surprising that neither we nor the First Circuit could find support for the proposition that our Constitution implicitly codified the ever-evolving caprices of as-yet un-constituted international bodies because the Constitution wasn't made to work that way.

When we want to define, for instance, the phrase "the freedom of speech," we don't look to modern newspapers or modern dictionaries or modern statutes for an understanding of what that phrase means *today*. We, instead, apply a constitutional baseline: "the freedom of speech" as it was understood at the Founding.[14] Otherwise, we'd be allowing future generations to curtail our basic constitutional rights. *See* SCALIA & GARNER at 405 ("If an open-ended provision whose application to

---

[14] This is why the Supreme Court has never agreed with Justice Black's oft-repeated position on the First Amendment, which was that "the Founders of our Nation . . . meant precisely that the Federal Government should pass 'no law' regulating speech and press[.]" *Mishkin v. State of N.Y.*, 383 U.S. 502, 518 (1966). The Court has, instead, allowed our government to impose the kinds of limited speech restrictions that were deemed permissible in 1791. *See United States v. Stevens*, 559 U.S. 460, 468 (2010) ("From 1791 to the present, however, the First Amendment has permitted restrictions upon the content of speech in a few limited areas, and has never included a freedom to disregard these traditional limitations." (cleaned up)); *cf.* ROBERT BORK, THE TEMPTING OF AMERICA: THE POLITICAL SEDUCTION OF THE LAW 147–48 (1990) ("The neutral definition of the principle derived from the historic Constitution is also crucial. . . . The first amendment states that 'Congress shall make no law . . . abridging the freedom of speech,' but no one has ever supposed that Congress could not make some speech unlawful or that it could not make all speech illegal in certain places, at certain times, and under certain circumstances. Justices Hugo Black and William O. Douglas often claimed to be first amendment absolutists, but even they would permit the punishment of speech if they thought it too closely 'brigaded' with illegal action. From the beginning of the Republic to this day, no one has ever thought Congress could not forbid the preaching of mutiny on a ship of the Navy or disruptive proclamations in a courtroom.").

extant phenomena can be 'redefined' [by later generations]—a First Amendment, for example, that can be redefined not to protect offensive speech—it is an open-ended guarantee that guarantees nothing at all."). And that's how constitutional exegesis works more generally. *See, e.g.*, *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2136 (2022) ("'Constitutional rights are enshrined with the scope they were understood to have when the people adopted them.'" (quoting *Dist. of Columbia v. Heller*, 554 U.S. 570, 634–35 (2008))); *McDonald v. City of Chicago*, 561 U.S. 742, 829 (2010) (Thomas, J., concurring) ("When interpreting constitutional text, the goal is to discern the most likely public understanding of a particular provision *at the time it was adopted*." (emphasis added & cleaned up)).

So too here. The international-law constraint the First Circuit imported into the Felonies Clause—*viz.*, that Congress can define and punish "Felonies" only to the extent that it does so in a way that complies with international norms—must be (if it's to be anything at all) the baseline international rule that prevailed at the Founding, not whatever rule the international community (such as it is) might later decide to follow. Otherwise, we'd be allowing future international rule-makers to expand or constrict Congress's legislative power.

So, what was the international norm that prevailed at the Founding? Well, the First Circuit told us: "It is a bedrock principle of the international law of the sea, recognized long before the founding of this country, that all nations have an equal and untrammelled right to navigate on the high seas." *Dávila-Reyes II* at 180 (cleaned up). "To ensure this right of free navigation," the court said, "international law generally prohibits any country from asserting jurisdiction over foreign vessels on the high seas, and vessels are normally considered within the exclusive jurisdiction of the country *whose flag they fly*." *Ibid.* (emphasis added & cleaned up). So, "[t]o preserve this system of *flag-state* jurisdiction, every vessel *must sail under the flag of one and only one state*; those that sail under *no flag* . . . enjoy *no legal protection*." *Ibid.* (emphasis added & cleaned up).

That's it in simple terms: When a vessel was flying under the flag of one country, as the First Circuit's sources seem to confirm, it was to be treated as a floating part of the flag state.[15] *See* Andrew W. Anderson, *Jurisdiction over Stateless Vessels on the High Seas: an Appraisal Under Domestic and International Law*, 13 J. MAR. L. & COM. 323, 338 (1982) (noting that "*the display of a flag* . . . is such strong evidence of nationality that it can be said to create a presumptive or *prima facie* nationality." (emphasis added)). But, when a vessel sailed without a flag, it was fair game for interdiction. *See, e.g.*, *United States v. Pinto-Mejia*, 720 F.2d 248, 260 (2d Cir. 1983) (explaining that "a stateless vessel, which does not sail under the flag of one state to whose jurisdiction it has submitted, may not claim the protection of international law and does not have the right to travel the high seas with impunity"); *United States v. Rubies*, 612 F.2d 397, 403 (9th Cir. 1979) ("'In the interest of order on the open sea, a vessel not sailing under the maritime flag of a State enjoys no protection whatever, for the freedom of navigation on the open sea is freedom for such vessels only as sail under the flag of a State.'" (quoting 1 LASSA OPPENHEIM, INTERNATIONAL LAW 546 (7th ed. 1948))). There was, however, *no rule*—not then and, as we're about to see, not now—that prevented a state from boarding a flagless vessel if, after the ship's crew claimed a nation of registry, the country of claimed registry refused to confirm or deny the crew's claim.

And it's undisputed that our Defendants (like the defendants in *Dávila-Reyes II*) were traveling *without* a flag—and *without* the registration papers of any nation—and that the MDLEA provision at issue here (as in *Dávila-Reyes II*) *presupposes* the interdiction of only *flagless* vessels, *see* § 70502(d)(1)(C)— vessels that, to use the First Circuit's words, "enjoy no legal protection," *see, e.g.*, *Matos-Luchi*, 627 F.3d at 6 (noting that "international law . . . treats the 'stateless vessel' concept as informed by the need for effective enforcement," and adding that, as a result, "a vessel may be deemed 'stateless,' and subject

---

[15] Of course, this rule also came with exceptions for "the interest of all maritime nations." 1 LASSA OPPENHEIM, INTERNATIONAL LAW 336 (2d ed. 1912).

to the enforcement jurisdiction of any nation on the scene, if it fails to display or carry insignia of nationality and seeks to avoid national identification"). That should have been the end of that.

*Three*, even if international law constrained Congress's power under the Felonies Clause—and even if the international rule we should apply is whatever rule happens to be in effect today or tomorrow or the day after that—*Dávila-Reyes II* still got it wrong. That's because the First Circuit never actually identified a rule of international law that conflicts with § 70502(d)(1)(C). Here's the rule the court claimed to have found: "[I]nternational law," the panel said, "recognizes that an oral claim by the vessel's master constitutes prima facie proof of the vessel's nationality." *Dávila-Reyes II* at 186. But look closely at the sources the First Circuit cited for this "prima facie" test:

> Absent a flag or papers, "a vessel may also traditionally make an oral claim of nationality when a proper demand is made." *Matos-Luchi*, 627 F.3d at 5; *see also Aybar-Ulloa*, 987 F.3d at 5 (quoting *Matos-Luchi*, 627 F.3d at 5); *United States v. Obando*, 891 F.3d 929, 939 (11th Cir. 2018) (Black, J., specially concurring) (noting that, under "longstanding principles of admiralty law," the master "speak[s] on behalf of the ship" and must be the one to make a verbal claim of nationality); *The Little Charles*, 26 F. Cas. 979, 982 (Marshall, Circuit Justice, C.C. Va. 1818) ("The vessel acts and speaks by the master."); *Anderson* [Andrew W. Anderson, *Jurisdiction over Stateless Vessels on the High Seas: an Appraisal Under Domestic and International Law*, 13 J. MAR. L. & COM. 323, 337 (1982)] (noting that a vessel may claim nationality "by showing its flag, presenting its documents, or making *some other outward or oral claim to a nationality*").

*Id.* at 184 (emphasis in original & cleaned up). None of the sources the First Circuit cited in this passage outline anything like the "prima facie" test *Dávila-Reyes II* seems to have invented. Worse, none of them even purport to promulgate any kind of rule of international law. Indeed, none of the cited sources is an international law-making body; they're all (but one) judges of the United States— and the one who isn't (Anderson) was an American admiralty lawyer. Worst of all, none of them suggest—as the First Circuit implied—that the failure of a country of claimed registry to confirm (or

deny) the crewmembers' claims somehow "displaces" (*id.* at 187), in an international-law-violating sort of way, the "prima facie" norm these sources don't really seem to stand for.[16]

*Four*, even if the First Circuit *had* found a "currently applicable" international rule that conflicted with the MDLEA, the facial challenge in *Dávila-Reyes II* should still have been rejected. Facial challenges are "discouraged," *Sabri v. United States*, 541 U.S. 600, 609 (2004), and succeed only when a defendant can "establish that no set of circumstances exists under which the [statute] would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987). In *Dávila-Reyes II*, the First Circuit came up with several examples of situations in which § 70502(d)(1)(C) *could be* applied consistently with international law. *See Dávila-Reyes II* at 192 ("Importantly, we do not suggest that international law requires the United States to accept a bare assertion of nationality where there is conflicting evidence and attempts to resolve the conflict prove fruitless. Although the master's oral declaration constitutes prima facie proof of nationality, that verbal assertion can be undermined by contrary evidence, as is the case for any prima facie showing. For example, if the vessel's claimed nationality differs from the nationality of most crew members, or if a small vessel is interdicted far from the claimed country, U.S. authorities could properly seek verification of the master's claim. In other words, where surrounding

---

[16] Indeed, the one non-judge source the First Circuit cited for the existence of *a* prima facie test refers only to the making of an oral claim of nationality in the context of a ship's assertion of immunity when it's approached, *during wartime*, by a belligerent nation's warship. *See* Anderson at 341 ("[I]nternational law requires flag states to provide documents of nationality to their vessels, and international custom requires that they be carried on board the vessels. It is not enough that a vessel have a nationality; she must claim it and be in a position to provide evidence of it. International law recognizes the right of a warship to approach a vessel on the high seas and demand that the vessel identify herself and verify her nationality. Given the nature of registration with a state as being in the nature of an immunity, a vessel must obviously have an obligation to assert that immunity by showing its flag, presenting its documents, or *making some other outward or oral claim* to a nationality; otherwise it waives that immunity." (emphasis added & cleaned up)). Obviously, this passage doesn't create (or even contemplate) the generally applicable prima facie test the First Circuit relied on. It does, however, say something else interesting. *Ibid.* ("The decision of the State Department to treat the vessel as stateless should be treated as a political claim to jurisdiction which may not be tested in the judicial forum, but only in the international diplomatic arena."). Unfortunately, the First Circuit ignored this part of Anderson's article and "tested" the defendants' jurisdictional claim in a "judicial forum" anyway.

facts provide legitimate reason to doubt an oral claim of nationality, international law would permit the United States to treat the vessel as stateless absent the sort of confirmation required by § 70502(d)(1)(C)."); *ibid* ("Put differently, when U.S. authorities are presented with mixed signals about the nationality of a vessel, it would be permissible under international law for the United States to seek confirmation from the country of asserted nationality and, if none is forthcoming, to treat the vessel as stateless."). Since these examples establish that "circumstances exist[ ] under which the [statute] would be valid," *Salerno*, 481 U.S. at 745, the court should have resisted the facial attack.

***

All of which is to say that we **DENY** the Defendants' facial challenge to § 70502(d)(1)(C) of the MDLEA.

## II.     The As-Applied Challenge

The Defendants also insist that the MDLEA is unconstitutional as applied to them. Here, they make two arguments—both unavailing.

*First*, they say that the exercise of jurisdiction in this case is unconstitutional because the offense took place within "the EEZ [which] is neither territorial waters nor the high seas." Motion at 9. The Defendants, remember, were arrested 169 nautical miles from the Dominican Republic— within Venezuela's EEZ, but beyond its territorial waters. And (the Defendants argue) a country's EEZ is not "the high seas" for purposes of the Felonies Clause. *Ibid.* ("[T]he EEZ is neither territorial waters nor the high seas. It is something distinct, with features of both. Most significant for present purposes, however, is that under customary international law, the EEZ is *not* the High Seas[.]"). The Defendants' argument thus turns on two propositions: (1) that "Congress's power to act under the Felonies Clause . . . is plainly limited to offenses committed 'on the high Seas,'" *id.* at 8 (cleaned up); and (2) that, "under customary international law, the EEZ is *not* the High Seas," *id.* at 9. We've already rejected the first assumption (*see supra* § I) and find the second no more convincing.

The EEZ, after all, *is* part of the "high seas." As the Eleventh Circuit has said, the "high seas" include "all waters which are neither territorial seas nor internal waters of the United States or any foreign country." *United States v. McPhee*, 336 F.3d 1269, 1273 (11th Cir. 2003) (citation omitted). "The United States generally recognizes the territorial seas of foreign nations up to twelve nautical miles adjacent to recognized foreign coasts." *Ibid.*[17] Beyond these twelve miles lie the high seas. *See United States v. Louisiana*, 394 U.S. 11, 23 (1969) ("Outside the territorial sea are the high seas[.]").[18]

And this makes sense. As Judge Wilkinson, writing for the Fourth Circuit, explained:

> The EEZ bordering a particular nation's territorial sea is merely a part of the high seas where that nation has special economic rights and jurisdiction. UNCLOS [United Nations Convention on the Law of the Sea] grants coastal nations certain rights to natural resources within the EEZ, as well as jurisdiction over marine scientific research and protection and preservation of the marine environment. . . . Any allocation of economic rights, however, is a far cry from conferring on a nation the exclusive authority endemic to sovereignty to define and punish criminal violations. . . . The question then becomes where exactly [the nation's] territorial sea ends and the high seas begin. The weight of authority points to an outer territorial limit of twelve nautical miles[.] . . . UNCLOS explicitly restricts territorial seas from extending farther than twelve nautical miles from national coastlines. . . . [A] nation's territorial waters generally extend to twelve nautical miles.

*United States v. Beyle*, 782 F.3d 159, 167–68 (4th Cir. 2015) (Wilkinson, J.) (cleaned up);[19] *see also United States v. Dire*, 680 F.3d 446, 460 n.11 (4th Cir. 2012) (noting "the twelve-mile boundary set by

---

[17] *See also* United States Proclamation on an Exclusive Economic Zone, 22 I.L.M. 461, 462 (Mar. 10, 1983) ("The United States will respect only those territorial sea claims of others in excess of 3 nautical miles, to a maximum of 12 nautical miles, which accord to the U.S. its full rights under international law in the territorial sea."); United States Ocean Policy, Statement by President Reagan, 22 I.L.M. 464, 464 (Mar. 10, 1983) ("[T]he United States will recognize the rights of other states in the waters off their coasts, as reflected in [the United Nations Convention on the Law of the Sea], so long as the rights and freedoms of the United States and others under international law are recognized by such coastal states.").

[18] *See also* U.N. Convention on the Law of the Sea, pt. II, § 2, art. III, Dec. 10, 1982, 1833 U.N.T.S. 397 ("Every State has the right to establish the breadth of its territorial sea *up to a limit not exceeding 12 nautical miles*, measured from baselines determined in accordance with this Convention." (emphasis added)); *see also id.* at pt. V, art. 58 (distinguishing the rights and duties a country might have within its EEZ from those it retains within its territorial waters).

[19] Notably, every judge in this District who has decided this question has agreed with Judge Wilkinson that a nation's EEZ is part of the high seas. *See Grueso*, 2022 WL 1650098, at *6 ("[S]everal courts,

international law today" that "demarcat[es] a nation's territorial waters from the high seas"); *United States v. Williams*, 617 F.2d 1063, 1073 n.6 (5th Cir. 1980) (recognizing that the en banc Fifth Circuit had previously held that the "12-mile limit includes the territorial sea, which extends to three miles from the coast, and the contiguous zone, which extends from three to 12 miles from the coast . . . [and] [t]he high seas lie seaward of the territorial sea and thus encompass the contiguous zone" (cleaned up)).

Simply put, "the Eleventh Circuit and other courts define the area outside of 12 miles from a nation's coast—and thus, a nation's Exclusive Economic Zone—as the high seas for purposes of the MDLEA." *Alfonso*, No. 21-cr-20306-CMA, ECF No. 47 at 7; *see also Delgado-Pachay v. United States*, 2020 WL 1820506, at *3 (M.D. Fla. Apr. 10, 2020) (Jung, J.) (noting that "350 nautical miles south of the Guatemala/Mexico border [is] far beyond the territorial seas of any country and thus in international waters (*i.e.*, 'the high seas')," and adding that, "under international law, the territorial seas of any nation do not extend beyond twelve nautical miles"); *Butler v. United States*, 2014 WL 12597847, at *2 (S.D. Fla. June 16, 2014) (Altonaga, J.) (denying a motion to dismiss an MDLEA indictment because, among other things, "[a] vessel thirteen miles from a foreign coast is in international waters"); *Dilbert v. United States*, 2013 WL 5408444, at *3 (M.D. Fla. Sept. 25, 2013) (Moody, J.) ("[The] Petitioner implicitly argues that this Court should consider the 200-nautical-mile exclusive economic zone [ ] as territorial waters[.] This misinterprets UNCLOS, which defines the EEZ as 'an area *beyond and adjacent to the territorial sea*.' [The] Petitioner does not cite any authority to explain why a Court in this circuit is not required to follow Eleventh Circuit precedent in *McPhee* and apply the 12-nautical-mile definition of territorial waters.").

---

including some in this district, have held that a nation's EEZ remains part of the high seas and does not fall within the territorial waters of that nation."); *Waters*, 2022 WL 1224728, at *4; *Mendez*, 2022 WL 1202889, at *6; *De Leon Berroa*, 2022 WL 1166535, at *4; *Barros*, 2022 WL 1135707, at *6; *Alfonso*, No. 21-cr-20306-CMA, ECF No. 47 at 5–6 & n.2.

Trying to parry, the Defendants point to 33 C.F.R. § 2.32(d) for their view that, under U.S. law, a country's EEZ *is* in the high seas. *See* Motion at 9–10. And that provision does say that, "[u]nder customary international law as reflected in the 1982 United Nations Convention on the Law of the Sea and without prejudice to high seas freedoms that may be exercised within exclusive economic zones pursuant to article 58 of the United Nations Convention on the Law of the Sea, and unless the context clearly requires otherwise . . . , *high seas* means all waters that are *not the exclusive economic zone* . . . , territorial sea . . . , or internal waters of the United States or any other nation." 33 C.F.R. § 2.32(d) (emphasis added). But that's not the regulation that applies here. Instead, § 2.32(c) governs the Coast Guard's interdiction of vessels on the high seas, and it provides that, "[f]or the purposes of 14 U.S.C. [§] 522 [and three other sections], high seas *includes the exclusive economic zones* of the United States and other nations, as well as those waters that *are seaward of the territorial seas* of the United States and other nations." 33 C.F.R. § 2.32(c) (emphases added).[20] In other words, the relevant regulation confirms what we already knew—that the EEZ *is* part of the high seas.

We thus **DENY** the Defendants' as-applied challenge.

## III.    Nexus

Finally, one of our Defendants (Goitia) contends that "there [must] be minimal contact between the United States and Goitia to comply with Due Process." Goitia's Reply at 3. And here, he argues, "there are absolutely no contacts between the United States and Goitia." *Ibid.* Because Goitia failed to make this claim in his MTD, he's forfeited the argument. *See In re Egidi*, 571 F.3d 1156, 1163

---

[20] We know that § 2.32(c) governs cases like ours because, by its own terms, it applies to the kinds of situations contemplated in 14 U.S.C. § 522, which is the statute that empowers the Coast Guard to "make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States." That's precisely what our case is about. The more specific provision (§ 2.32(c)) thus governs over the more general one (§ 2.32(d)). *See* SCALIA & GARDNER at 184 ("[T]he general/specific canon does not mean that the existence of a contradictory specific provision voids the general provision. Only its application to cases covered by the specific provision is suspended; it continues to govern all other cases.").

(11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."). Forfeiture or not, the argument is meritless. *See Campbell*, 734 F.3d at 806; *Cruickshank*, 837 F.3d at 1190; *Estupinan*, 453 F.3d at 1338 n.2; *United States v. De La Garza*, 516 F.3d 1266, 1272 (11th Cir. 2008); *United States v. Rendon*, 353 F.3d 1320, 1325 (11th Cir. 2003); *Marino-Garcia*, 679 F.2d at 1383); *United States v. Pierre et al.*, 2022 WL 3042244, at *19 (S.D. Fla. Aug. 2, 2022) (Altman, J.).

So, consistent with Eleventh Circuit precedent, we **DENY** this aspect of the Motion as well. *See, e.g.*, *Campbell*, 743 F.3d at 810 ("[T]he conduct proscribed by the [MDLEA] need not have a nexus to the United States because universal and protective principles support its extraterritorial reach."); *United States v. Ruiz-Murillo*, 736 F. App'x 812, 817 (11th Cir. 2018) ("Subsequent cases reaffirm [the] holding that the MDLEA does not require a nexus to the United States." (citing *United States v. Wilchcombe*, 838 F.3d 1179, 1186 (11th Cir. 2016))).

\*     \*     \*

"Those embarking on voyages with holds laden with illicit narcotics, conduct which is contrary to laws of all reasonably developed legal systems, do so with the awareness of the risk that their government may consent to enforcement of the United States' laws against the vessel." *United States v. Gonzalez*, 776 F.2d 931, 941 (11th Cir. 1985). After careful review, we hereby **ORDER and ADJUDGE** that the Defendants' Motion [ECF No. 30] is **DENIED**.

**DONE AND ORDERED** in Miami, Florida, this 15th day of August 2022.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record